```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,                          :
                                                   :
             v.                                    :    MEMORANDUM & ORDER
                                                   :    20-CR-541 (WFK)
MICHAEL CHARLES FEENEY,                            :
                                                   :
                         Defendant.                :
-------------------------------------------------------------X
```

**WILLIAM F. KUNTZ, II, United States District Judge:**

On December 10, 2020, Michael Charles Feeney ("Defendant") pled guilty to one count of transmitting a threatening interstate communication in violation of 18 U.S.C. § 875(c). The Court now sentences him and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress contained in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is sentenced to eighteen months of incarceration followed by three years of supervised release with special conditions.

## BACKGROUND

On October 1, 2020, the Government filed a Complaint against Defendant alleging on or before July 24, 2020, he knowingly and intentionally transmitted in interstate commerce, from the Southern District of Florida to the Eastern District of New York, a communication containing a threat to injure the person of another, to wit: a threat to kill and cause serious bodily injury to John Doe and his family, individuals whose identities are known to the United States Attorney. On December 10, 2020, Defendant waived indictment and pled guilty to a single-count Information charging him with Threatening Interstate Communication, in violation of 18 U.S.C. § 875(c), pursuant to a plea agreement. *See* Plea Agreement, ECF No. 11. The Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

**I.      Legal Standard**

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case. The "starting point and the initial benchmark" in evaluating a criminal sentence is the Guidelines sentencing range. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a district court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form." *Id.*

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.). Section 3553(a) provides a set of seven factors for the Court to consider in determining what sentence to impose on a criminal defendant. The Court addresses each in turn.

II. Analysis

    A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

    1. <u>Family and Personal Background</u>

Defendant was born Michael Charles Feeney on January 4, 1961, in Kingston, New York. Presentence Investigation Report ("PSR") ¶ 39, ECF No. 24. He is one of three children born to Bernard and Mary (née O'Reilly) Feeney. *Id.* Both of his parents are deceased. *Id.* His

father was a family court judge in Ulster County, New York and died in 1989 at the age of 57. *Id.* Defendant's mother worked as a substitute teacher until Defendant was a teenager. *Id.* She died in 2019, at the age of 85. *Id.*

Defendant has one living sibling and one who is deceased. *Id.* ¶ 40. Mary Kathryn Solner died in 2010, at the age of 46, leaving behind a husband and two children. *Id.* Bernard Feeney, III, age 61, is divorced with three children and works at a bank. *Id.* Defendant does not know his brother's current whereabouts. *Id.* Defendant stated he has not spoken to his brother since their mother's death. *Id.*

Defendant reported that he was reared in a middle-income household in Kingston, free from major hardship, financial or otherwise. *Id.* ¶ 41. He reported good relationships with both parents, describing his father as the "best father [he] could ask for," and his mother as "like a best friend," adding that he spoke to her daily until her death. *Id.* He was very close with his sister, who was only a year younger than the defendant and had an amicable relationship with his brother until after his mother passed. *Id.* Overall, he described his childhood as having "everything we needed, even if it wasn't what we wanted." *Id.*

In approximately 1980, Defendant moved to Florida for employment purposes. *Id.* ¶ 42. He lived in the cities of Pompano Beach and Fort Lauderdale for a few years before briefly relocating to Massachusetts to work for a construction company. *Id.* In his late 20s, he relocated to New York, New York, where he lived for approximately twenty years before returning to Florida. *Id.*

Defendant has been married twice. *Id.* He married Elisa Trivigno in the late 1980s. *Id.* The marriage ended in the early 1990s, due to personal differences. *Id.* No children were born from this marriage. *Id.* In the late 1990s, Defendant met his current wife, Silvana (nee Belotti)

3

Feeney (age 67), through friends. *Id.* ¶ 43. Defendant's wife previously worked as an embassy worker, for an import/export company, and as a translator (Spanish, Portuguese, Italian and French). *Id.* They married approximately a year after meeting in Ft. Lauderdale. *Id.* No children were born from the marriage; however, his wife has three adult children (and four grandchildren) from a prior marriage. *Id.* Defendant's wife has health issues, and Defendant provides support for her. *Id.*

Defendant's wife described him as generous, and as a caring husband and stepparent. *Id.* ¶ 44. She stated that he loves her children as if they were his own, and she recalled his devotion to his late mother. *Id.* His wife stated that when Defendant becomes upset, he is "not a gentleman" but was not able to provide an explanation as to how or why he became involved in the instant offense. *Id.* She is aware of Defendant's conviction and remains supportive of him. *Id.*

Defendant has lived in Florida since approximately 2000. *Id.* ¶ 45. He has lived at the address of record for approximately four years. *Id.* The neighborhood is described as residential and middle-income. *Id.* Defendant lives with his wife. *Id.* Property records indicate the unit is owned by Defendant's late mother. *Id.*

2. <u>Physical Condition, History of Substance Abuse</u>

Defendant suffers from several physical health problems, which contributed to his early retirement. He reported suffering from 2 strokes, though his wife said he had suffered from three strokes. After the first stroke, which occurred approximately six years ago, he was hospitalized for two and a half weeks. Defendant reported he was not able to walk for the first week but

returned to work shortly thereafter. The second stroke occurred one year later, and Defendant suffered from limited use of his left leg and arm.

Defendant also reported suffering from emphysema; chronic blood clots; vascular disease in his legs; arthritis, enlarged prostate, Chronic Obstructive Pulmonary Disease (COPD), deep venous thrombosis, history of hepatitis C, lung nodules, and ulcers. He reported that he walks with a cane due to the vascular disease.

Defendant reported no past or current mental health issues, though he reported feelings of stress and anxiety due to the instant offense. Defendant reported experimenting with marijuana a few times in his life. He reported occasional consumption of alcohol, consisting of a few beers once or twice a week. Notably, Defendant is not subject to drug or alcohol testing as a condition of bond. As reported in the Criminal History section of this report, Defendant has a prior conviction for driving while intoxicated in 1982.

3.  Legal History, Nature of Offense

Defendant was convicted of disorderly conduct in West Palm Beach, FL in 1981, driving with an unlawful blood alcohol level in West Palm Beach, FL in 1982, and speeding in Saugerties, New York in 1995. PSR ¶¶ 24-26. However, given the age of these convictions, they result in a criminal history score of zero. *Id*. ¶27. Defendant was also arrested for misdemeanor aggravated assault, driving with a suspended license, and failure to appear in the early 1980s. PSR ¶¶ 35-37.

By way of background for the instant offense, Individual #1 is an attorney who represented John Doe, whose identity is known to the Government, in a criminal prosecution in a state case in Queens, New York. PSR ¶ 5. John Doe, who is Black, punched a white male one time, causing the white male to hit his head and die from his injuries. *Id*. In February 2020,

5

John Doe was convicted of Assault in the third degree, a misdemeanor, following a bench trial. *Id*. In July 2020, John Doe was sentenced to probation and community service. *Id*.

On July 24, 2020, Individual #1 received a voicemail from a male caller, later determined to be Defendant, who stated "this is for the n****r lover [last name of the attorney]." PSR ¶ 6. Defendant referenced the sentence imposed on John Doe and advised Individual #1 to tell John Doe to hire security because "we know where every one of his family members live," and "we will execute that n****r's family. They will be hunted down and f**king beaten to death." *Id*. Defendant was arrested on October 7, 2020 and made no post-arrest statements. PSR ¶ 9.

The Government also provided information pertaining to alleged additional interstate threats by Defendant, which are unconnected, but similar in nature and execution, to the instant offense. This conduct cannot be included in the Guidelines calculation for the count of conviction.

1. On June 1, 2020, following the death of George Floyd at the hands of Minneapolis, Minnesota police officers, several days of protests and looting occurred in cities across the United States, including in Chicago, Illinois. A week later, photographs circulated of Chicago Police Department (CPD) officers in the Chicago office of U.S. Representative Bobby Rush with some of the officers sleeping on the couch and making coffee and popcorn, reportedly during the unrest. On June 11, 2020, Representative Rush, who is Black, condemned the photographs. On an unreported date, Defendant left a voicemail message at the offices of the Congressman, stating: "Hey n****r Rush! You stupid racist motherf***er. We're praying that everyone in your family gets their head cut off and shit down their throats . . . you filthy n****r you should be hanging in the rotundo [sic] with

6

that other dead n****r where everyone is going to use it for a urinal but piss all over that other f***ing monkey and you should be swinging with a fan blowing to make you move around and they can beat you like a pinata, you f***ing worthless n*****r mother***er, you deserve to get Corona and die you c**ks***er!"

2. On June 22, 2020, the San Francisco 49ers football team flew a Black Lives Matter flag outside of Levi's Stadium in Santa Clara, California.  On June 24, 2020, Defendant called an office line at Levi's Stadium without identifying himself and expressed his opinion about the flag.  Defendant stated, "we have a list of all employees and everyone is subject to beat downs on a regular basis every time they walk out of that building and then hopefully everyone there will get Covid and die for supporting a terrorist group."  Santa Clara Police Department officers interviewed the employee, who stated that while the communication did not contain a specific threat and that the employee believed the caller was "letting off steam," the longer Defendant spoke, the more aggressive he became.  Levi's Stadium staff took steps to increase the security of its employees.

3. On July 24, 2020, Defendant left a voicemail at the offices of U.S. Representative Alexandria Ocasio-Cortez, in which he referred to her repeatedly as a "sp*c" and a "whore."  In the 78-second message, Defendant stated, "Cortez is nothing but a worthless race baiter c**t sp*c.  She should be lynched, and she should be swinging from a f***ing tree . . she's a no-good f***ing c**t, we're going to pray that someone cuts her head off.  There's got to be one decent American in New York who will chop her head off and shit down her throat.  You f***ing worthless c**t!  Die from Corona, b**ch!"  While the case agent could not distinguish a particular incident that caused Defendant to leave the

message, Defendant referenced Representative Ocasio-Cortez's testimony on the floor of the House of Representatives and appearances on television.

4. On August 4, 2020, deputies from the Martin County, Florida, Sheriff's Office (MCSO) visited Defendant in response to an investigation by security staff at ESPN. Defendant had made telephone threats to ESPN broadcaster Dan LeBatard. The threats stated that LeBatard should hire security for himself and his family, that the caller knows where LeBatard lives, and that his family would face violence. Specifically, the family would be dragged out into the streets, where their heads would be ripped off, and "shit" forced down their throats. While it was unclear what LeBatard had said that upset Defendant LeBatard had made comments criticizing the ESPN's aversion to politics and President Trump's tweets telling four minority congresswomen to "go back" to the "crime-infested places from which they came." When the MCSO contacted Defendant, he reportedly smelled of alcohol and had trouble keeping his balance. Defendant admitted to making a call to ESPN, claiming he had a right to say what he wanted; however, he said he realized it was the wrong thing to do and that he did not have any specific intent to harm LeBatard. The MCSO determined that there was no credible threat.

B. **The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

8

The instant sentence recognizes the seriousness of the Defendant's offense in transmitting threatening communications and provides for both specific and general deterrence. As noted, Defendant allegedly sent additional interstate threats to other recipients around the same time as the instant offense. The Court's sentencing will deter others from engaging in similar acts and justly punishes Defendant for his offense.

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to one count of transmitting threatening interstate communications pursuant to a written plea agreement. *See* Plea Agreement ¶ 1. For this offense, Defendant faces a statutory maximum term of imprisonment of five years, a term of supervised release of not more than three years, a term of probation of not less than one nor more than five years, a maximum fine of $250,000.00, and a mandatory special assessment of $100.00. 18 U.S.C. §§ 875(c), 3583(b)(2), 3561(c)(1), 3571(b), and 3013. Defendant may also be required to pay the costs incurred by the United States in prosecuting Defendant, *see* United States Sentencing Commission, Guidelines Manual ("USSG") § 5E1.5, and the Court may order Defendant to pay restitution to any victim of his offense. 18 U.S.C. § 3663A.

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" *Id.* § 3553(a)(4)(A).

The applicable Guideline for a violation of 18 U.S.C. § 875(c) is Guideline § 2A6.1. The base offense level for this violation is 12. *Id.* § 2L1.2(a). Defendant intentionally selected a

9

victim as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of the person; therefore, the offense level is creased by 3 levels under USSG § 3A1.1(a).  Because Defendant has clearly demonstrated acceptance of responsibility for the offense, the offense level is decreased by 2 levels under USSG § 3E1.1(a).  Accordingly, Defendant's adjusted offense level is 13.  In addition, Defendant's criminal record results in a criminal history score of 0, which yields a criminal history category of I.  *See* PSR ¶ 28; USSG Ch. 5, Pt. A.  For an offense level of 13 and a criminal history category of I, the Sentencing Guidelines suggest a term of imprisonment of twelve to eighteen months.  *See* USSG Ch. 5, Pt. A.

    Defense counsel urges the Court to impose a term of probation in lieu of incarceration.  Def. Mem. at 2.  In support, defense counsel cites to several cases in which probation has been imposed for 18 U.S.C. § 875(c) convictions.  *Id*. (citing *U.S. v. Aaron Michael Heineman*, 2:11-CR-432-DN-1, D. Utah; *U.S. v. Ryan Walsh* (4:13-CR-269, E.D. Mo.; and *U.S. v. Gage H. Clausen*, 6:20-CR-10058, D. Kan.).  In addition, Defense counsel states, "No objective would be advanced by incarceration of Mr. Feeney."  Def. Mem. at 2.

    The Government contends that a sentence within the Guidelines range of twelve to eighteen months of imprisonment is appropriate.  Gov. Mem. at 1.

    Probation recommends a sentence of six months in custody and two years of supervised release with the following special conditions:

1. 6 months community confinement at a Residential Reentry Center;
2. Defendant shall not associate in person, through mail, electronic mail, the internet, social media, telephone, or any other means with any victim or witness of the instant offense, or any of the victims as noted in "Additional Criminal Conduct" in the presentence report;

3. Defendant shall participate in a mental health evaluation with a provider approved by the U.S. Probation Department.  Defendant shall contribute to the cost of services rendered, via co-payment or full payment, in an amount to be determined by the Probation Department, based upon the defendant's ability to pay and/or the availability of third-party payment;

4. Upon request, Defendant shall provide the U.S. Probation Office with full disclosure of his financial records, including co-mingled income, expenses, assets, and liabilities, to include yearly income tax returns.  With the exception of the financial accounts reported and noted within the presentence report, Defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Office.  The defendant shall cooperate with the Probation Officer in the investigation of his financial dealings and shall provide truthful monthly statements of his income and expenses.  Defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Office access to the defendant's financial information and records.

PSR Recommendation at 1, ECF No. 24-1.  Probation does not recommend a fine because Defendant does not appear to have the ability to pay.  PSR Addendum, ECF No. 29 at 3.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor, requiring the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission," 18 U.S.C. § 3553(a)(5), is not pertinent to Defendant's sentencing.

### F. The Need to Avoid Unwarranted Sentence Disparities

11

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense," 18 U.S.C. § 3553(a)(7). Although restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A, the victim was contacted and did not report any loss. PSR ¶ 76.

### CONCLUSION

The Court finds that a sentence of eighteen months of incarceration followed by three years of supervised release is consistent with and is sufficient but no greater than necessary to accomplish the purposes of § 3553. The Court also adopts the following special conditions of supervised release:

1. Defendant shall not associate in person, through mail, electronic mail, the internet, social media, telephone, or any other means with any victim or witness of the instant offense, or any of the victims as noted in "Additional Criminal Conduct" in the presentence report; and

2. Defendant shall participate in a mental health evaluation with a provider approved by the U.S. Probation Department. Defendant shall contribute to the cost of services rendered, via co-payment or full payment, in an amount to be determined by the Probation

Department, based upon the defendant's ability to pay and/or the availability of third-party payment.

The Court also expressly adopts the factual findings of the Presentence Investigation Report, barring any errors contained therein.

**SO ORDERED.**

s/ **WFK**
_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: February 25, 2022
       Brooklyn, New York

13